IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Norris L. Sellers, | ) | C/A No.: 3:11-2803-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Giant Cement Holding, Inc. d/b/a Giant Recovery Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this employment discrimination case, Norris L. Sellers ("Plaintiff") is suing his former employer, Giant Cement Holding, Inc. d/b/a Giant Recovery Services ("Defendant"). Plaintiff alleges race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII"). [Entry #1 at 2].

This matter comes before the court on Defendant's motion for summary judgment filed on September 21, 2012. [Entry #25]. Plaintiff filed a response on October 23, 2012 [Entry #37], and Defendant filed a reply on November 2, 2012 [Entry #38]. The motion having been fully briefed, it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the court grant Defendant's motion for summary judgment.

I.    Factual and Procedural Background[1]

Defendant processes waste byproducts for use as fuel.  [Entry #37-2 at 16–19].
Defendant hired Plaintiff, an African American, as a laboratory technician in its Sumter,
South Carolina facility ("Sumter Lab") on June 4, 2003.  [Entry #25-3 at 2].  His direct
supervisor was Joe Stinney, also African American.  *Id.*  Mr. Stinney evaluated Plaintiff
on November 23, 2003.  [Entry #26-6].  He found that Plaintiff was meeting expectations
in 8 of 13 categories, but was only partially meeting expectations in the remaining
categories of quality of work, versatility, attendance and punctuality, safety and
housekeeping, and cost consciousness.  *Id.* at 3.  He also gave Plaintiff an overall rating
of partially meets expectations and noted that Plaintiff needed to eliminate the "rush
factor" in his work to eliminate mistakes.  *Id.* at 4.

Plaintiff became a staff chemist on May 10, 2004.  [Entry #25-5 at 2].  As a staff
chemist, Plaintiff's job responsibilities were as follows:

> The staff chemist primary area of responsibility is clean product analysis,
> that is, QA/QC [quality assurance/quality control] incoming samples from

---

[1] In summarizing the relevant facts, the undersigned has not included references to the
records that Plaintiff challenges as inadmissible hearsay.  [Entry #37 at 24–25].  In
excluding these records from the factual background, the undersigned does not intend to
suggest Plaintiff's admissibility argument is correct.  Rather, the records are not
necessary to support a recommendation that Defendant's motion be granted.

The undersigned also disregards Plaintiff's affidavit attached to his response brief.
[Entry #37-1 at 2–5].  *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962
(4th Cir. 1996); *Fuller v. Cnty. of Charleston*, 444 F. Supp. 2d 494, 499 (D.S.C. 2006)
(citing *Larken v. Perkins*, 22 Fed. Appx. 114, *1 (4th Cir. 2001) (noting that the district
court properly found a party's "own, self-serving affidavit [s] containing conclusory
assertions and unsubstantiated speculation" insufficient to stave off summary judgment)).
The undersigned finds that Plaintiff's affidavit does not provide any objective evidence
not already in the record.

2

> the rail terminal and distillation.  The secondary area of responsibility is instrument maintenance and QC.  It is also the staff chemist's responsibility to help maintain and to effectively administer the laboratory's quality control program.  In brief, his responsibilities include but are not limited to the following: keep up to date calibrations on the FID, ECD, and TCD instruments; conduct training on the making of standards; trouble shoot instrument maintenance problems; maintain relationships with vendors and all tech support areas.

[Entry #26-4 at 5].  Plaintiff described the lab's main function as analyzing samples to make sure that no polychlorinated biphenyls ("PCBs") were introduced into the product tanks.  [Entry #25-2 at 6; Entry #26-5 at 2].

Plaintiff was again evaluated on November 18, 2004.  [Entry #27 at 3].  He was noted to partially meet expectations for quality of work, but met or exceeded expectations in the remaining categories.  *Id.* at 4.  The evaluation noted that Plaintiff needed to improve his "understanding of the instrumentation and test methods used in the lab" and to "stop trying to do all the samples at one time, causes mistakes to happen."  *Id.* at 5.

On November 23, 2005, Plaintiff was appraised by Mr. Stinney and noted to partially meet expectations for safety and housekeeping.  [Entry #27-1 at 4].  Plaintiff met or exceeded expectations in all remaining categories and his overall performance met expectations.  *Id.*  Mr. Stinney indicated that Plaintiff needed improvement in managing his time and multi-tasking.  *Id.* at 5.  In 2007 and 2008, Mr. Stinney rated Plaintiff's overall performance as meeting expectations.  [Entry #27-2 at 12; Entry #27-3 at 14].  Mr. Stinney was later admonished "for not addressing [Plaintiff's] true shortcomings" in the 2008 appraisal.  [Entry #27-4 at 2].

At least as early as June of 2008, Chris Rivers (Caucasian) became the supervisor over all of Defendant's labs.  [Entry #25-2 at 27].  Plaintiff reported to Mr. Stinney, who

reported to Mr. Rivers.  [Entry #37-2 at 25, 28].  Defendant's vice president/general manager, Al Smith, sent Mr. Rivers, who had been the Lab Manager at Giant's Harleyville location, to the Sumter Lab and other of Defendant's locations to evaluate and standardize the QA/QC documentation, standard operating procedures ("SOPs"), and general performance of the labs.  [Entry #26-3 at 3–6].

Plaintiff testified that prior to Mr. Rivers becoming supervisor over all of the labs, the Sumter Lab was operating well, following SOPs, and did not have any major incidents or contaminations.  [Entry #37-7 at 6, 12, 20].

On April 7, 2009, Mr. Rivers met with Mr. Stinney regarding a "lab problem" and noted that "[t]he standards made by [Plaintiff] were giving different results from the production GC [gas chromatograph] than those on the Lab GC."  [Entry #27-5].  Plaintiff recalls discussions with Mr. Stinney or Mr. Rivers regarding the issues outlined in the documentation from the April 7 meeting. [Entry #25-2 at 30].

On September 11, 2009, the second shift manager, Charlie Taylor (Caucasian) failed to identify a clear indication of PCBs on a routine sample scan.  [Entry #1 at ¶ 5].  The error resulted in 10,000 to 20,000 gallons of contaminated fuel that could not be used and had to be disposed of.  [Entry #25-2 at 37].  Mr. Rivers concluded that Plaintiff had not properly trained Mr. Taylor.  [Entry #29-3 at 4].  Although Mr. Stinney recommended that Mr. Taylor be disciplined three to five days without pay, Mr. Rivers decided not to discipline him in any way.  [Entry #37-4 at 16].  Plaintiff testified that it was his responsibility to train Mr. Taylor to find PCBs, but that Mr. Taylor failed to identify the PCBs on September 11, 2009, because he failed to look.  [Entry #30-3 at 23].  Plaintiff

further testified that following the incident on September 11, 2009, Mr. Rivers asked him to complete the development of new methods and protocols using the GC within two weeks. [Entry #30-3 at 7–8].

On September 30, 2009, Mr. Rivers sent an e-mail to Mr. Stinney and Plaintiff stating he had concerns with the methods being employed at the Sumter Lab and was coming to Sumter the following day to review them. [Entry #28-3 at 2]. Upon his visit, Mr. Rivers found the methods had not been revised as he had requested. [Entry #25-2 at 38–39]. Plaintiff testified that the method revisions were not completed because "we still had to run the business." [Entry #25-2 at 39]. Plaintiff admitted that it took him about six to eight weeks to get the work completed in light of how busy he was with his other work. [Entry #30-3 at 8–9].

On October 23, 2009, Mr. Rivers sent an e-mail to Gerry Geier, Vice President of Human Resources, regarding Mr. Rivers' "assessment that the Lab Manager [Stinney] and  Chemist [Plaintiff] have demonstrated an incompetence which must be addressed." In this e-mail, Mr. Rivers explained that:

> [a] detailed examination of [Plaintiff's] practices and tactics . . . reveals a serious incompetence and a lack of basic understanding of Gas Chromatographic theory. Repeated and intensive sessions to review/revise GC methods and to reduce his unnecessary data manipulation have not resulted in any solution worthy of a Staff Chemist. All recently modified methods scans and QA/QC daily runs contain a level of label and report omissions/inconsistencies which are unacceptable given the long timeframe which was allowed for these few modifications to be completed.

[Entry #29-1 at 2].

On November 4, 2009, Plaintiff received a performance evaluation with an overall rating of "meets expectations" from Mr. Stinney. [Entry #29-2 at 12]. Mr. Stinney

5

testified that after reviewing the evaluation, Mr. Rivers called him and described the evaluation as "blatantly incorrect." [Entry #29-3 at 3]. According to Mr. Stinney, Mr. Rivers stated that he was going to "go ahead and do [Plaintiff's] review." *Id.* On November 11, 2009, Plaintiff received an annual performance evaluation from Mr. Rivers with an overall assessment of "fails to meet expectations—requires significant improvement." [Entry #30 at 3]. Mr. Rivers commented as follows:

> In this year you have demonstrated a lack of understanding of the basic GC instrument theory and the requirements of the GCECD method. Attempts to modify methods (even with specific directives by Chris Rivers) left the lab operations in serious jeopardy for compliance with PCB screening requirements . . . for over three weeks. This situation is still not stabilized to my satisfaction and will require outside help to comply. This does not help lab cost control. Routine duties of the Staff Chemist to support functional lab instrument operation and effective support of Chemical Resale and Distillation is unacceptably below GLP requirements. There is not the sense of urgency to provide outstanding service to internal customers. Reponses to requests for information from upper management (Chris Rivers) and internal customers are too slow. The instrument lab operation is ineffective and obvious signs of improper sample preparation and failure to follow sample prep methods for PCBs are ignored.

*Id.* Plaintiff was advised that failure to adequately perform his duties, comply with Mr. Rivers' instructions in a timely way, or deliver complete and accurate requested information would be grounds for termination. *Id.* In his handwritten comments on the evaluation, Plaintiff noted his disagreement with the assessment, apologized for not finishing the development of new methods more quickly, and admitted to making mistakes. *Id.* at 3, 7 ("Some of set up was difficult and mistakes were made but it was a learning experience."). He stated that he felt that with Mr. Rivers' help, he was a much better chromatographer. *Id.* at 7. Plaintiff's handwritten comments did not indicate he felt the negative performance evaluation was in any way related to his race. *Id.* at 3–9.

6

On November 12, 2009, Mr. Rivers sent Plaintiff an e-mail regarding continuing problems in the Sumter Lab, including inadequate GC scans and cross contamination. [Entry #30-1 at 2].

On November 30, 2009, Mr. Rivers sent Gerry Geier an update on his follow-ups with Plaintiff. [Entry #31-1 at 2]. After outlining what he had requested from Plaintiff, Mr. Rivers stated Plaintiff had not complied with the required reporting until the week of November 23, 2009, and that Plaintiff "[stated that he understood] the seriousness of the lab failures but [had not been] motivated to produce improved results." *Id.* Mr. Rivers reported that lab staff from Defendant's Harleyville facility had been sent to the Sumter Lab to rectify the problems caused by "incompetent lack of attention to normal protocols and practices." *Id.* Mr. Rivers summed up this report as follows: Plaintiff's "gross incompetence must be considered a serious matter and corrected as soon as possible." *Id.*

Mr. Rivers reprimanded Plaintiff in writing on April 13, 2010, stating that Plaintiff's "[c]alibration . . . was undertaken on 3-29-10 without consulting the Labs Manager . . . in direct violation of directives given by e-mail and [Mr. Rivers'] direct verbal communication." [Entry #31-3 at 2]. Mr. Rivers advised Plaintiff that another such occurrence would result in "disciplinary action including suspension without pay for 1–3 days." *Id.* Plaintiff recalled receiving the reprimand, but testified that he was acting pursuant to orders from a supervisor. [Entry #30-3 at 12].

> In an email dated April 15, 2010, Plant Manager Karl Chandler (Caucasian) stated: Chris [Rivers] has brought to me today a very urgent concern about being in compliance due to [Plaintiff's] competency in critical areas. It appears that [Mr. Rivers] is instructing/teaching . . . and [Plaintiff] just doesn't do it differently at all and has a blank stare when talked to about it. It's really beyond employees not being able to do the job, it's potential major

7

compliance issues that we cannot allow.  We need to do something right now.  [Plaintiff] must be removed from doing GC work related to our RCRA Permit immediately.  He can do other things that don't have those implications if we must continue to employ him.

[Entry #31-4 at 2].  Defendant terminated Mr. Stinney on approximately April 15, 2010.  [Entry #37-2 at 58].  Mr. Stinney testified that he believed his race was a motivating factor in his termination.  [Entry #37-4 at 22].  Mr. Stinney was ultimately replaced with a white male.  [Entry #37-5 at 6].

On May 20, 2010, Plaintiff received another reprimand for poor job performance for his failure to review PCB scans and take appropriate action.  [Entry #31-5 at 2].  Mr. Rivers stated, "This is a serious failure of performance and technical oversight.  If this failure occurs again it will result in suspension without pay and possible termination of employment."  *Id.*  Plaintiff's handwritten notes on the reprimand state that Ronald Siau, the PCB chemist at the Harleyville facility reviewed the scans and stated that Plaintiff was correct, but that Plaintiff never had a chance to tell Mr. Rivers because he had stopped working due to cancer.  *Id.*  Mr. Rivers died in August 2010.  [Entry #37-6 at 4].

On June 7, 2010, Mr. Chandler provided Plaintiff with a letter outlining Defendant's concerns with Plaintiff's performance.  [Entry #31-6 at 2].  The letter indicated that it was Plaintiff's final warning and last chance to demonstrate his ability to perform his assigned tasks.  *Id.*  He was given a 30-day probationary period and advised that if his performance did not sufficiently improve, his employment would be terminated.  *Id.*  Plaintiff signed the document indicating that he read and understood the "Notice to Correct Deficiencies."  *Id.*  Plaintiff testified that, at least by June 7, 2010, he

understood that his supervisors had serious concerns regarding his performance, going back to his 2009 performance evaluation. [Entry #30-3 at 21].

The next day, Plaintiff sent a written response to the June 7, 2010, notice. [Entry #31-7 at 2–4]. Plaintiff indicated that he had never been told that he was being evaluated on a biweekly basis and disputed Mr. Chandler's assertion that some of Plaintiff's job responsibilities had been reassigned because he was not completing them successfully. *Id.* at 3. He stated that he was "tired of being singled out for no reason" and wanted to do his job better each day. *Id.* at 4.

In late June 2010, Marleen Gillespie (Caucasian) expressed her shock at Plaintiff's inability to use a pipette, writing "[a]t a minimum, I would expect any employee with a chemist responsibility, and 5 plus years of experience to be able to use a pipette. . . . [I]t is a normal lab tool. . . . I do not think it is unreasonable to believe that our staff Chemist could use this pipette without personal instruction. . . . In this case, we have provided him with the right tools for the task, and his ability has fallen short." [Entry #32 at 2]. Plaintiff testified that he was trained without the use of pipettes and that Ms. Gillespie was just being "picky, picky, picky." [Entry #30-3 at 15–16]. He then admitted that he did not think it was picky for Ms. Gillespie to expect him to know how to use a pipette, but stated that he thought it was unprofessional of her not to show him how to use the pipette. *Id.* at 16.

On July 13, 2010, Defendant terminated Plaintiff's employment for unsatisfactory work performance. [Entry #32-3 at 2]. In a termination letter dated July 14, 2010, Mr.

Chandler stated that Plaintiff's performance had not improved since the letter dated June 7, 2010. [Entry #32-3 at 2].

II. Discussion

A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

B. Analysis

Plaintiff asserts a single cause of action for race discrimination under Title VII.[2] In a Title VII claim, absent direct evidence of discrimination, as is the case here, Plaintiff must prove his allegations under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. Under *McDonnell Douglas*, Plaintiff first must establish by a preponderance of evidence each element of his prima

---

[2] Defendant argues that to the extent Plaintiff is asserting a hostile work environment claim, he has failed to state a viable claim. [Entry #25-1 at 23–26]. Plaintiff did not respond to Defendant's argument and has not asserted a hostile work environment in his complaint; therefore, the undersigned finds that Plaintiff is not attempting to assert such a claim and does not address it herein.

facie case of discrimination. *Id.* at 802. To state a prima facie claim of race discrimination, Plaintiff must prove: (1) he is a member of a protected class; (2) he was performing satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. *Texas Dep't. of Cmty Affairs v. Burdine*, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143. Throughout the burden-shifting scheme set forth in *McDonnell-Douglas*, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally discriminated against him.

      1.      Plaintiff's Job Performance

Defendant concedes that Plaintiff is a member of a protected class and that he

suffered an adverse employment action. [Entry #25-1 at 17]. However, Defendant argues that Plaintiff was not performing his job satisfactorily. *Id.* at 18–19. In support of this contention, Defendant relies on the negative performance reviews and write-ups set forth above. *Id.* Recognizing the existence of documentation demonstrating poor job performance, Plaintiff contends that Mr. Rivers was "developing a paper trail by which to terminate the Plaintiff." [Entry #37 at 25]. He argues that many of the write ups contained misrepresentations and false information and that any deficiencies in his performance were caused by Defendant's unrealistic and unattainable expectations. *Id.*

As an initial matter, Plaintiff argues that a number of documents relied on by Defendant contain inadmissible unauthenticated hearsay. [Entry #37 at 24–25]. These documents consist primarily of Mr. Rivers' notes that Plaintiff appears to argue cannot be authenticated because Mr. Rivers is deceased. Defendant contends that the documents are admissible as business records and pursuant to the unavailable declarant exception to the hearsay rule. [Entry #38 at 13–16]. For purposes of ruling on Defendant's motion for summary judgment, the undersigned need not determine whether the disputed records would be admissible. The disputed records, created by Mr. Rivers and Ms. Gillespie, provide documentation of Plaintiff's unsatisfactory performance. However, there are numerous undisputed records that likewise document Plaintiff's shortcomings. *See* Entries ##26-6, 27, 28-3, 25-2, 29-1, 30, 30-1, 31-3, 31-4, 31-5, 31-6, and 32.

Although Plaintiff asserts that he had an unblemished performance record prior to Mr. Rivers taking a supervisory role over the Sumter Lab [Entry #37 at 24], the records document performance issues as early as 2003. [Entry #26-6]. Mr. Rivers' concerns

regarding Plaintiff's inability to timely revise the lab methods, his general lack of understanding regarding GC theory, and lack of attention to normal protocol and practices are well-documented. *See, e.g.*, Entries ##29-1, 30, 31-1, and 31-3. In addition, Plaintiff admitted that he did not complete his revisions of the methods within the time prescribed by Mr. Rivers and admitted to making mistakes in his work. [Entry #30 at 7; Entry #30-3 at 8–9]. The record establishes that Plaintiff was not meeting Defendant's reasonable expectations prior to his termination.

Plaintiff contends that when Mr. Rivers took over supervision of the Sumter Lab, he immediately took issue with Plaintiff's race and set to build a case for termination against him in violation of Title VII. [Entry #37 at 24]. Plaintiff asserts that many of the documents reflecting his negative performance contain misrepresentations and false information. In support, however, he relies on his own deposition testimony, his own affidavit in opposition to summary judgment, and, to a lesser degree, the testimony of Mr. Stinney. With respect to opinion testimony, the Fourth Circuit has repeatedly explained that a plaintiff's perception of himself is not relevant. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998); *Evans v. Techs Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996). Likewise, the opinion of a plaintiff's co-workers that "[she] did a good job, or that [she] did not 'deserve' [to be discharged], is close to irrelevant." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991) (footnote omitted). Furthermore, the undersigned has disregarded Plaintiff's self-serving affidavit. *See* footnote 1, *supra.* Consequently, Plaintiff has failed to present reliable evidence to demonstrate that his poor performance record was motived by discriminatory animus

such that it should be disregarded.

Likewise unavailing is Plaintiff's argument that Defendant's expectations were unrealistic and unattainable rather than legitimate. An employer's expectations of its employees are "legitimate" when they are honestly held; whether the employee agrees with those expectations is not the test. *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 30 (2d Cir. 1997) (stating that "a plaintiff must satisfy the employer's honestly-held expectations"). In this context, the term "legitimate" means that expectations cannot be a "sham designed to hide the employer's discriminatory purpose." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006). Plaintiff has presented no evidence demonstrating that Defendant's expectations were unreasonable other than his own testimony.

Plaintiff's unsupported speculation that Mr. Rivers was racist and that his expectations were unrealistic is insufficient to show that Defendant's expectations were not legitimate. A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

For the foregoing reasons, the undersigned recommends finding that Plaintiff failed to establish the second element of his prima facie case and recommends granting summary judgment to Defendant.

2.     Treatment of Similarly-Situated Employees

Defendant also contends that Plaintiff has not met his burden of showing similarly-situated employees have been treated more favorably.  [Entry #25-1 at 20]. Plaintiff asserts that Charlie Taylor is similarly situated for purposes of this analysis. [Entry #37 at 27–28].  Defendant disputes that assertion.  [Entry #25-1 at 20].

When a plaintiff bases his discrimination claim on a similarly-situated comparator, it is the plaintiff's "task to demonstrate that the comparator is indeed similarly situated." *Haywood v. Locke*, 387 Fed. Appx. 355, 359 (4th Cir. 2010) (citing *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  Plaintiffs are required to show that they are similar in all relevant respects to their comparator.  *Haywood*, 387 Fed. Appx. at 359. "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Id.*

Mr. Taylor, who is Caucasian, failed to identify the presence of PCBs on September 11, 2009, resulting in significant contamination of Defendant's product. [Entry #1 at ¶ 5].  Mr. Rivers concluded that Plaintiff had not properly trained Mr. Taylor.  [Entry #29-3 at 4].  Mr. Taylor was not reprimanded for his role in the September 11, 2009, incident.  *Id.*

Defendant contends that Plaintiff and Mr. Taylor were not similarly situated because they occupied different positions.  [Entry #25-1 at 20].  Defendant further contends that it was Plaintiff's job to train Mr. Taylor and to develop processes that

would ensure that individuals in Mr. Taylor's position did not make mistakes. *Id.* Plaintiff argues that Mr. Taylor's failure to catch the PCBs was not a training issue and that Mr. Taylor admitted that the contamination was his fault. [Entry #37 at 27–28]. Plaintiff further argues that he and Mr. Taylor were similarly situated because they both had the responsibility to prevent contamination of blended fuel, although it was Mr. Taylor's job to detect the PCB hit and Plaintiff's job to review it. *Id.* at 28.

The task falls on Plaintiff to identify a suitable comparator, bearing in mind that "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Bradley v. S.C. Dep't. of Corr.*, C/A No. 3:08–2510–JFA, 2010 WL 883729 (D.S.C. March 5, 2010) (citing *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)). Here, the only evidence advanced by Plaintiff to demonstrate that he and Mr. Taylor were similarly situated is that they both had responsibility to prevent contamination of blended fuel. While that may be true, their responsibilities related to preventing contamination were not the same. Plaintiff's duty to train Mr. Taylor and to develop lab methods for use by individuals in Mr. Taylor's position demonstrates that Plaintiff's responsibilities were greater. Consequently, Plaintiff has failed to establish that the two men were "subject to the same standards" or "engaged in the same conduct without such differentiating or mitigating circumstances." *Haywood*, 387 Fed. Appx. at 359.

Plaintiff argues that he is also similarly situated to Ron Siau, a Caucasian male who performed duties similar to Plaintiff at another of Defendant's labs. [Entry #37 at 28]. Plaintiff admits that he did not make such allegations in his complaint. *Id.* In its

16

reply brief, Defendant did not address Plaintiff's argument that he and Mr. Siau were similarly situated. However, given that Mr. Siau was not involved in the incident on September 11, 2009, resulting in extensive and costly contamination, the undersigned recommends a finding that the two men are not similarly situated.

Based on the foregoing, the undersigned recommends a finding that Plaintiff has failed to set forth a suitable comparator for purposes of his prima facie case.

3.    Pretext Analysis

Even assuming Plaintiff were able to establish a prima facie case of discrimination, summary judgment is still appropriate because Defendant has proferred a legitimate, nondiscriminatory reason for his dismissal, and Plaintiff has failed to submit evidence that the reason is merely pretext for discrimination. Defendant asserts that it terminated Plaintiff for his failure to meet his supervisors' expectations and for failure to improve his performance after numerous warnings, counseling sessions, and a 30-day probationary period. [Entry #25-1 at 21]. Plaintiff concedes that Defendant has set forth a legitimate, non-discriminatory reason for his termination. [Entry #37 at 29, n.1]. The burden, therefore, shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143.

"At this point, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (internal citations omitted). In order to satisfy this burden, it is not sufficient

for Plaintiff to show merely that Defendant's asserted reason is false; rather, Plaintiff must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515–16.  Here, the undersigned finds that Plaintiff has failed to identify a genuine dispute of material fact as to whether his termination was the result of intentional discrimination.

Plaintiff bases his pretext argument on evidence that he claims raises an inference of discrimination.  Central to his argument is the assertion that Defendant's stated reason for terminating him is untrue.  He argues that "the sheer volume of the write ups" can be inferred to suggest that Mr. Rivers was trying to build a case against Plaintiff so that he could terminate him.  [Entry #37 at 29].  Employers frequently "build cases against" underperforming employees.  Doing so does not demonstrate discrimination vel non. Plaintiff also claims that the write ups contain false and misleading information from which it can be inferred that Mr. Rivers was "not attempting to help Plaintiff to succeed in his employment, but he actually held discriminatory animus towards the Plaintiff based on his race and simply wanted to be able to fire the Plaintiff."  *Id.*  This argument is problematic because Plaintiff's contention regarding the allegedly false and misleading write ups is based on his own self-serving testimony and is disregarded for the reasons set forth in the undersigned's discussion of the prima facie case.  In addition, Plaintiff impermissibly attempts to build one inference upon another.  *See Beale*, 769 F.2d at 214. As Defendant points out, Plaintiff's pretext argument is replete with speculation and inferences.  [Entry #38 at 8–11 (listing 25 inferences and "suggestions" offered by Plaintiff to support his claim)].  These inferences are insufficient to demonstrate that

discrimination was the real reason Defendant terminated Plaintiff.

Plaintiff's pretext argument is undercut by the evidence showing that he responded to his poor performance evaluations on several occasions and never indicated that he felt he was being reprimanded because of his race. For example, in response to his 2009 performance evaluation, Plaintiff noted his disagreement with the evaluation, but admitted to making mistakes and apologized for not completing the method revisions earlier. [Entry #30 at 3]. He made no mention of perceived racial discrimination. Plaintiff also drafted a two-page written response to the Notice to Correct Deficiencies dated June 7, 2010. In his letter, Plaintiff disputed that that he was not successfully performing his job and stated that he was "tired of being singled out for no reason." [Entry #31-7 at 3–4]. Plaintiff did not suggest that there was any discriminatory motive behind the problems identified in the Notice to Correct Deficiencies.

Furthermore, where a plaintiff alleges discrimination claims under Title VII and simultaneously alleges that the true motivating factor before the employer's allegedly wrongful actions was something other than a prohibited factor under Title VII, summary judgment is appropriate as to the Title VII claims. *Shivers v. S.C. Dept. of Corr.*, C/A No. 3:09-3357, 2011 WL 4549266, at *8 (D.S.C. Sept. 1, 2011) (citing *Lightner*, 545 F.3d at 261, 263–64). The plaintiff in *Lightner*, a police officer, claimed his employment was terminated because of his race and gender, and also because of his internal investigation regarding other officers' failure to report automobile accidents. *Id.* at 262. The Fourth Circuit held that "Lightner's acknowledgment that he was fired to stop his internal investigation negates his claims of race and gender discrimination.

Consequently, his suspension, however wrongful, is not actionable under Title VII and the defendants are entitled to summary judgment." *Id.* at 264.

In this case, Plaintiff has likewise acknowledged that Mr. Rivers' actions may have stemmed from his ongoing battle with cancer. Plaintiff testified that Mr. Rivers was extremely sick and should have been at home. [Entry #30-3 at 13]. He further testified that Mr. Rivers became more picky and critical because of his illness. [Entry #25-2 at 41]. Thus, Plaintiff has failed to show that Mr. Rivers' allegedly unrealistic and unattainable expectations were discriminatory in nature. In addition, even if Mr. Rivers' expectations were unreasonable, courts do not sit as "super personnel departments second guessing an employer's perceptions of an employee's qualifications." *Malghan v. Evans*, 118 Fed. Appx. 731 (4th Cir. 2004) (citing *Smith v. Univ. of N.C.*, 632 F.2d 316, 346 (4th Cir. 1980)).

Because Plaintiff has failed to offer evidence demonstrating Defendant's decision to terminate him was racially motivated, the undersigned recommends granting Defendant's motion for summary judgment.

III.    Conclusion and Recommendation

For the foregoing reasons, it is recommended that Defendant's motion for summary judgment [Entry #25] be granted and this case be dismissed with prejudice.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 8, 2013                                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

20

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).